IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| SALLY J. ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:13-CV-748 |
| | ) | |
| VOLVO GROUP NORTH AMERICA, LLC, | ) ) | |
| | ) | |
| Defendant. | ) | |

# **MEMORANDUM OPINION AND ORDER**

Catherine C. Eagles, District Judge.

The plaintiff, Sally J. Robinson, has sued the defendant, Volvo Group North America, LLC, alleging she was discharged because of her race. Because Ms. Robinson has failed to proffer any direct evidence of discrimination or sufficient circumstantial evidence to raise an inference of discrimination, the Court will grant the defendant's motion for summary judgment.

## **FACTS**[1]

Ms. Robinson began working for Volvo as an Accounts Receivable Specialist on January 17, 2000. (*See* Doc. 8 at ¶ 3; Doc. 20-1 at 2.) She was promoted to Billing Supervisor in October 2006, (Doc. 20-2 at 11), where she reported to Marian Carter.

---

[1] The stated facts are either undisputed or taken from the evidence viewed in the light most favorable to the plaintiff, the non-moving party. Docket references are to the docket number and page number appended by the CM-ECF system.

(Doc. 20-1 at 9-10.)  The entire time she worked for Volvo, her evaluations were positive as to her knowledge and job skills, and her co-workers and managers often praised her expertise.  (*See* Doc. 20-2 at 42-46, 47-55; Doc. 21-4 at 1; Doc. 21-5 at 1.)

In 2009, Ms. Robinson received negative comments on her "Volvo Group Attitude Survey" from her subordinates who "didn't accept [her] as their [s]upervisor," (Doc. 20-1 at 18; *see also* Doc. 21 at pp. 1-2 ¶ 2a), and had "issues" with "taking direction" from her. (Doc. 20-1 at 17.)  When Ms. Carter suggested placing her on a "Plan for Performance Improvement," Ms. Robinson requested and received a voluntary reassignment to a non-supervisory position.  (Doc. 20-1 at 19-21; *see also* Doc. 20-2 at 25.)

In 2010, Sandy Nemchin replaced Ms. Carter as Ms. Robinson's supervisor. (Doc. 20-1 at 34; *see also* Doc. 21 at pp. 17-18 ¶ 8.)  On August 17, 2010, Ms. Nemchin issued a written warning to Ms. Robinson, which stated that Ms. Robinson received a verbal warning "last week" from her then-manager, Dawn Francisco, about the way she interacted with managers and co-workers, and that immediately after the verbal warning, she was "accusatory and rude" to co-workers in a meeting and asked them to take responsibility for her assigned training duties.  (*See* Doc. 20-2 at 25; Doc. 20-1 at 47.)  In that warning, Ms. Nemchin told Ms. Robinson that further displays of disrespectful behavior would result in her termination.  (Doc. 20-2 at 25.)

Ms. Francisco and Ms. Nemchin gave Ms. Robinson an overall rating of "Did not meet expectations" on her 2010 "Personal Business Plan," Volvo's annual employee evaluation.  (*See* Doc. 20-2 at 32-39; Doc. 20-1 at 60.)  Ms. Robinson disagreed with the rating at the time.  (Doc. 20-1 at 58-59.)

In March 2011, Ms. Nemchin, Ms. Francisco, and Ms. Robinson discussed and signed a Plan for Performance Improvement because of Ms. Robinson's 2010 disciplinary write-up and annual evaluation. (*See* Doc. 20-2 at 40-41; Doc. 20-1 at 60-62.) Ms. Robinson's performance improved in 2011, (Doc. 20-2 at 42-46), and she received the "Master Builder" award for her superior management and training skills. (Doc. 21-4 at 1-2.)

In January 2012, Susan Fleckenstein replaced Ms. Francisco as Ms. Robinson's manager. (Doc. 20-1 at 63-64; *see also* Doc. 20-5 at ¶¶ 2-3.) In her 2011 evaluation, signed by Ms. Fleckenstein and Ms. Nemchin, Ms. Robinson received an overall rating of "Fully met expectations." (Doc. 20-2 at 42-46.)

In her 2012 evaluation, Ms. Fleckenstein and Ms. Nemchin gave Ms. Robinson an overall rating of "Mostly met expectations, some development identified/ agreed." (Doc. 20-2 at 47-55.) Ms. Fleckenstein wrote that Ms. Robinson was a valuable team member but had problems with "attitude and inconsistency." (Doc. 20-2 at 47.) Ms. Nemchin wrote that Ms. Robinson displayed a "negative pattern" of behavior that severely impacted her business relationships. (Doc. 20-2 at 47.) Ms. Robinson disagreed with these concerns and attached to her evaluation comments from co-workers praising her performance. (*See* Doc. 20-2 at 50-51; Doc. 21 at pp. 8-10 ¶ 3f.)

On January 8, 2013, Ms. Robinson participated in a conference call with Ms. Fleckenstein and Lisa Kirkley, a co-worker, the circumstances of which are disputed. (*See* Doc. 20-2 at 5-6; Doc. 20-5 at ¶ 10.) Ms. Fleckenstein has testified that Ms. Robinson interrupted Ms. Kirkley during the call, (Doc. 20-5 at ¶ 10), and Ms. Robinson

3

has testified that she did nothing disruptive or impolite during the call. (Doc. 21 at p. 13 ¶ 4f.)

One week later, on January 15, 2013, Ms. Robinson's co-worker, Branko Tosanovic, complained to Ms. Fleckenstein that Ms. Robinson had addressed him in a "rude and argumentative" manner. (Doc. 20-6 at ¶ 2.) Ms. Fleckenstein informed Ms. Robinson of this complaint in a January 16, 2013, meeting, where Ms. Robinson denied speaking rudely to Mr. Tosanovic. (Doc. 21 at pp. 13-14 ¶ 4h; *see also* Doc. 20-5 at ¶ 12.) Mr. Tosanovic joined the meeting and said that he felt bad for complaining. (Doc. 20-6 at ¶ 3; *see also* Doc. 21 at pp. 13-14 ¶ 4h.)

In mid-January 2013, Ms. Fleckenstein and Ms. Nemchin met with Julie Wellisley, Human Resources Business Partner, and informed her of problems they saw with Ms. Robinson's attitude and behavior. (Doc. 20-5 at ¶ 13; Doc. 20-4 at ¶ 11; Doc. 20-3 at ¶ 7.) On January 29, 2013, Ms. Wellisley told Ms. Robinson that her employment was terminated because she had been rude to Mr. Tosanovic. (*See* Doc. 21 at pp. 2-3 ¶ 2c; Doc. 20-5 at ¶ 13.) Volvo's records and evidence reflect that Ms. Robinson was terminated because of her history of rudeness, disrespectful behavior, and problems with co-workers. (*See* Doc. 20-3 at ¶¶ 7-8; Doc. 20-3 at p. 18.)

In her deposition, Ms. Robinson testified that she did not recall Ms. Nemchin ever making racial comments to her, (Doc. 20-1 at 51-52), and that she had not included any mention of racial comments in her EEOC complaint. (Doc. 20-1 at 53-54.) In her affidavit proffered in opposition to Volvo's motion for summary judgment, Ms. Robinson does not mention any racial comments made by any Volvo employee. (*See* Doc. 21.)

Ms. Robinson filed an EEOC charge of discrimination on February 26, 2013. (Doc. 8 ¶ 14.) She filed this lawsuit on September 6, 2013, asserting that her discharge was an intentional act of discrimination based on her race in violation of 42 U.S.C. § 2000e-2(a). (*See* Doc. 4.)

## ANALYSIS

Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…" 42 U.S.C. § 2000e-(2)(a)(1). A plaintiff may establish a Title VII violation by direct evidence, circumstantial evidence, or some combination of the two. *See generally Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) (discussing the ways discriminatory intent may be shown by direct or circumstantial evidence).[2]

---

[2] At times, the Fourth Circuit has suggested that direct or circumstantial evidence may establish discriminatory intent, separate and apart from the well-known prima facie case set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) ("To meet her burden on summary judgment, [the plaintiff] might have offered direct or circumstantial evidence, or proceeded under the proof scheme set forth in [*McDonnell Douglas*]."); *accord Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (noting that courts apply the *McDonnell Douglas* approach when the plaintiff produces no direct or circumstantial evidence of discrimination sufficient to warrant a mixed-motive analysis); *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005) (same); *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (same). At other times, the court has suggested that circumstantial evidence is the heart of the *McDonnell Douglas* approach. *See, e.g.*, *Laing v. Fed. Express Corp.*, 703 F.3d 713, 718-19 (4th Cir. 2013) ("Without the benefit of direct evidence to support her claim, [the plaintiff] next seeks to rely on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework." (citation omitted)); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000). Regardless of the method of proof used, the court has made it clear that "[t]he plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against her." *Evans*, 80 F.3d at 959 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Ms. Robinson testified that she cannot remember any racial comments made by any Volvo employee. (Doc. 20-1 at 51-54.) She has presented no direct evidence of discrimination and has not asserted in her brief that there is direct evidence of discrimination. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) ("Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude and (2) bear directly on the contested employment decision." (internal quotation marks omitted)).

Absent direct evidence, Ms. Robinson must present sufficient circumstantial evidence to raise an inference that she was terminated because of racial animus or discriminatory intent. *See Moore*, 754 F.2d at 1105. Ms. Robinson contends that Volvo's managers falsely accused her of rudeness and unprofessional conduct and did not terminate other Caucasian employees with similar disciplinary records. (Doc. 8 at ¶¶ 7, 8, 10, 13.) She contends that this is sufficient circumstantial evidence to allow the fact-finder to draw an inference of discrimination. (*See* Doc. 22 at 15-19.)

The usual method to establish discriminatory intent with circumstantial evidence is by proving a "prima facie case," often called the "*McDonnell Douglas*" test. *See supra* note 2. In termination cases, this test requires a plaintiff to prove four facts: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was performing at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) after termination, her position remained open or was filled by a similarly qualified applicant outside the protected class. *See King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *see also Hill v. Lockheed Martin Logistics Mgmt.*,

*Inc.*, 354 F.3d 277, 285 (4th Cir. 2004). Ms. Robinson concedes that she cannot establish a prima facie case under this test because she cannot show the fourth prong.[3] (Doc. 22 at 2.)

Ms. Robinson first contends that she has proffered sufficient circumstantial evidence of disparate treatment to get to the jury under the test set forth in *Hoyle v. Freightliner, LLC*, 650 F.3d 321 (4th Cir. 2011). (Doc. 22 at 4.) Under *Hoyle*, a plaintiff must show that (1) she is a member of a protected class; (2) "the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class;" and (3) she suffered more severe discipline than employees outside the protected class. *Hoyle*, 650 F.3d at 336. If a plaintiff proves these three elements, she establishes a prima facie case, and the burden shifts to the defendant to establish a nondiscriminatory reason for the termination. *See id.*; *Moore*, 754 F.2d at 1105-06.

It is undisputed that Ms. Robinson is a member of a protected class, (*see* Doc. 19 at 11), and that she was terminated whereas other Caucasian employees received less severe discipline. (*See* Doc. 19 at 14-20.) The issue is whether these other employees engaged in prohibited conduct comparable in seriousness to Ms. Robinson's. "The similarity between comparators and the seriousness of their respective offenses must be

---

[3] The undisputed evidence shows that Ms. Robinson's duties were distributed among existing employees and that there was no outside replacement. (*See* Doc. 22 at 2; *see also* Doc. 20-3 at ¶ 9.) The Fourth Circuit has noted exceptions to the requirement that a Title VII plaintiff show replacement by an individual outside of the protected class. *See Miles v. Dell, Inc.*, 429 F.3d 480, 486-89 (4th Cir. 2005). However, the Fourth Circuit has rejected the position that "a plaintiff may bypass prong four whenever the totality of her evidence gives rise to an inference of discrimination," *id.* at 487, and Ms. Robinson makes no argument that her claim should fall within any exception.

7

clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008). Courts must look at all relevant factors in determining whether two employees are in fact similarly situated. *See Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)), *aff'd*, 242 F. App'x 75 (4th Cir. 2007).

As noted *supra*, Volvo contends it terminated Ms. Robinson because of her rudeness to fellow employees and her disciplinary history. While Ms. Robinson identified several other employees who were disciplined without termination, she has failed to identify any employee with a comparable history and pattern of disciplinary issues. *See Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1228 (4th Cir. 1998) (noting that "[i]t would defy logic to look at each sort of attendance, disciplinary, or performance problem in a vacuum; it is the conglomeration of these issues that made [the plaintiff] an unsatisfactory employee that [the defendant] was justified in terminating").

It is undisputed that Ms. Robinson had problems with her co-workers while Ms. Carter supervised her in 2009, (Doc. 20-1 at 12-19), and that she voluntarily changed jobs as a result. (*See* Doc. 20-1 at 19-21; Doc. 20-2 at 25.) Problems recurred in 2010 when Ms. Nemchin and Ms. Francisco supervised her: she received a verbal warning and a later written warning for a separate incident, and she signed a Plan for Performance Improvement. (Doc. 20-2 at 25; Doc. 20-2 at 40-41.) Although her performance improved in 2011 when Ms. Nemchin and Ms. Fleckenstein supervised her, (*see* Doc. 20-2 at 42-46), problems with her co-workers recurred in 2012. (*See* Doc. 20-2 at 47.) While no write-ups were issued, Ms. Nemchin and Ms. Fleckenstein noted these

8

problems in her annual evaluation. (Doc. 20-2 at 47.) After additional incidents in 2013, Volvo terminated her employment. (Doc. 21 at p. 2 ¶ 2c.) Thus, to be comparable to Ms. Robinson, a co-worker would have a multi-year history of disciplinary problems. Ms. Robinson has identified no co-worker with such a history. *See Karpel*, 134 F.3d at 1228 (affirming summary judgment where the plaintiff failed to show that other employees had nearly the same history and number of disciplinary problems "across the board").

The co-worker most comparable to Ms. Robinson was disciplined similarly. The record indicates that S.B., a Caucasian employee, received a verbal warning for rudeness on January 20, 2012, (Doc. 20-3 at 22), and a written warning for using a rude tone with a supervisor on October 8, 2012. (Doc. 20-3 at 24.) S.B. received an overall rating of "Did not meet expectations" on her 2012 Personal Business Plan, (Doc. 20-3 at 25-29), and her supervisors placed her on a Plan for Performance Improvement in January 2013. (Doc. 20-3 at 30.) Thus, to this point, Ms. Robinson and S.B. were treated alike. Like Ms. Robinson, S.B.'s performance improved after she was placed on a Plan for Performance Improvement. (Doc. 20-3 at 30; *see also* Doc. 20-3 at ¶ 14.) Unlike Ms. Robinson, however, S.B. has since had no problems with rude behavior. (Doc. 20-3 at ¶ 14.)

Ms. Robinson has failed to present any similarly situated employee who engaged in comparable conduct – that is, a Caucasian employee who signed a Plan for Performance Improvement for disciplinary problems and later had problems reoccur – but was not terminated. *See Laing*, 703 F.3d at 721 (holding that "comparator evidence" requires proof of "an employee accused of violating the same company policy . . . who was given more favorable treatment"); *Hoyle*, 650 F.3d at 337 (affirming summary

9

judgment where the plaintiff failed to identify any similarly situated employee with extensive problems leading to a "last chance agreement"). Thus, she fails, as a matter of law, to prove the second prong under *Hoyle*. *See Hoyle*, 650 F.3d at 336.

Ms. Robinson also relies on *Karpel* to contend that Volvo falsified accusations of wrongdoing to such an extent to raise an inference of discrimination. (Doc. 22 at 6-7.) Even assuming these accusations were false, Ms. Robinson has presented no evidence that they were "racially motivated or that she was written up differently from other similarly situated employees." *Karpel*, 134 F.3d at 1228. Ms. Robinson merely speculates that she was accused of disciplinary problems because of her race, (*see* Doc. 20-1 at 51-52), and the evidence generally indicates that other Volvo employees accused of rudeness and insubordination were written-up in the same or a similar manner as Ms. Robinson. (*See* Doc. 19 at 14-20; Doc. 20-3 at 22, 24.) While a review of these employee personnel records certainly gives rise to an inference that Ms. Fleckenstein and Ms. Nemchin were not very good managers, this is a far cry from raising an inference of racial discrimination. Ms. Robinson's problems occurred while being supervised by multiple managers, which further attenuates any possible inference of discrimination.[4]

---

[4] Perhaps there could be a case where a dispute over the accuracy or truthfulness of an employer's allegations of an employee's misconduct would give rise to a jury question, but this is not that case. The record clearly establishes, and Ms. Robinson testified, that she had difficulties with several supervisors over a number of years, all of which were well-documented. (*See* Doc. 20-1; Doc. 20-2; Doc. 21.) Even if the specifics of some alleged incidents were not accurate or potentially false, there is no question, on the undisputed facts, that Volvo honestly believed there were problems with Ms. Robinson's behavior and her interactions with co-workers. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (holding that an "employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason [for the

There is one employee Ms. Robinson says was rude and insubordinate yet was not written-up; Ms. Robinson testified that J.C., a co-worker, repeatedly used profanity towards supervisors in meetings. (Doc. 20-1 at 39-40; Doc. 21 at p. 6 ¶ 2j.) This also occurred when Ms. Robinson was J.C.'s supervisor, and Ms. Robinson chose not to issue a write-up. (Doc. 20-1 at 39-40.) Ms. Robinson can hardly allege that Volvo discriminated against her as a result of her own decision not to write up J.C. While Ms. Robinson also testified that J.C. "cut[] off" and used profanity towards Ms. Fleckenstein in a different tone that Ms. Robinson believed "was just not - - not acceptable," (Doc. 20-1 at 39-40), that testimony, even assuming it is true, does not establish differential treatment. At most, Ms. Robinson's testimony establishes that she and Ms. Fleckenstein both believed J.C. should not be written-up for using profanity. It is difficult to see how an inference of discrimination could arise from this, and courts do not sit as a "super-personnel" department to second-guess supervisory decisions. *See DeJarnette v. Corning Inc.,* 133 F.3d 293, 299 (4th Cir. 1998) (noting that courts do "not sit as a kind of super-personnel department weighing the prudence of employment decisions made by [defendants] charged with employment discrimination").

Because she has not established that similarly situated employees were treated differently and more favorably, Ms. Robinson has not "eliminat[ed] the most common nondiscriminatory reasons for the disparate treatment." *Moore*, 754 F.2d at 1105 (citing

---

termination] was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred"); *Evans*, 80 F.3d at 960-61 ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." (quotation marks omitted)).

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)). Her circumstantial evidence is thus insufficient to allow the fact-finder to draw an inference of discrimination, and the defendant is entitled to summary judgment.

It is **ORDERED** that the defendant's motion for summary judgment, (Doc. 18), is **GRANTED**.

This the 4th day of November, 2014.

_____
UNITED STATES DISTRICT JUDGE